IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

KEVIN L. FUQUA,

    Petitioner,                         No. 2: 09-cv-2055 MCE KJN P

    vs.

CLAUDE E. FINN, et al.,

    Respondents.                   FINDINGS AND RECOMMENDATIONS

_____/

I. Introduction

        Petitioner is a state prisoner proceeding without counsel with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. In 1988 petitioner was convicted of first degree murder with use of a deadly weapon. Petitioner is serving a sentence of 27 years to life.

        In the instant action, petitioner challenges the 2006 decision by the California Board of Parole Hearings ("BPH") finding him unsuitable for parole. This was petitioner's initial suitability hearing.[1] (See Dkt. No. 10-3, at 89 of 130.)

        This action is proceeding on the original petition filed by petitioner on July 27, 2009. Petitioner alleges that there was insufficient evidence to support the decision finding him

---

[1] Although petitioner had previously appeared before the BPH, he had postponed his initial hearing so that he could be better prepared. (Id.)

1

unsuitable for parole.

II. Anti-Terrorism and Effective Death Penalty Act ("AEDPA")

In <u>Williams (Terry) v. Taylor</u>, 529 U.S. 362 (2000), the Supreme Court defined the operative review standard in a habeas corpus action brought pursuant to 28 U.S.C. § 2254. Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy between "contrary to" clearly established law as enunciated by the Supreme Court, and an "unreasonable application of" that law.  <u>Id</u>. at 405.  "Contrary to" clearly established law applies to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme Court on a point of law; or (2) if the state court case is materially indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is opposite.

"Unreasonable application" of established law, on the other hand, applies to mixed questions of law and fact, that is the application of law to fact where there are no factually on point Supreme Court cases which mandate the result for the precise factual scenario at issue. <u>Id</u>. at 407-08.  It is this prong of the AEDPA standard of review which directs deference be paid to state court decisions.  While the deference is not blindly automatic, "the most important point is that an *unreasonable* application of federal law is different from an incorrect application of law. . . . [A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." <u>Id</u>. at 410-11 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority. <u>Woodford v. Viscotti</u>, 537 U.S. 19 (2002).

"Clearly established" law is law that has been "squarely addressed" by the United States Supreme Court. <u>Wright v. Van Patten</u>, 552 U.S. 120 (2008).  Thus, extrapolations of settled law to unique situations will not qualify as clearly established. <u>See</u> <u>e.g.</u>, <u>Carey v.</u>

Musladin, 549 U.S. 70, 76 (2006) (established law not permitting state sponsored practices to inject bias into a criminal proceeding by compelling a defendant to wear prison clothing or by unnecessary showing of uniformed guards does not qualify as clearly established law when spectators' conduct is the alleged cause of bias injection).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority, in arriving at their decision. Early v. Packer, 537 U.S. 3 (2002). Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an unreasonable application of, established Supreme Court authority. Id. An unreasonable error is one in excess of even a reviewing court's perception that "clear error" has occurred. Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003). Moreover, the established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts. Early v. Packer, 537 U.S. at 9.

However, where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record in adjudication of that issue. "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

When reviewing a state court's summary denial of a claim, the court "looks through" the summary disposition to the last reasoned decision. Shackleford v. Hubbard, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000).

III. Analysis

Petitioner alleges that there was insufficient evidence to support the BPH's 2006 decision finding him unsuitable for parole.

////

The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits state action that "deprive[s] a person of life, liberty or property without due process of law." U.S. Const. amend. XIV, § 2. A person alleging a due process violation must demonstrate that he or she was deprived of a protected liberty or property interest, and then show that the procedures attendant upon the deprivation were not constitutionally sufficient. Kentucky Dep't. of Corrs. v. Thompson, 490 U.S. 454, 459-60 (1989); McQuillion v. Duncan, 306 F.3d 895, 900 (9th Cir. 2002). A protected liberty interest may arise from either the Due Process Clause itself or from state laws. Board of Pardons v. Allen, 482 U.S. 369, 373 (1987). In the context of parole, the United States Constitution does not, in and of itself, create a protected liberty interest in the receipt of a parole date, even one that has been set. Jago v. Van Curen, 454 U.S. 14, 17-21 (1981). However, when a state's statutory parole scheme uses mandatory language, it "'creates a presumption that parole release will be granted' when or unless certain designated findings are made, thereby giving rise to a constitutional liberty interest." McQuillion, 306 F.3d at 901 (quoting Greenholtz v. Inmates of Neb. Penal, 442 U.S. 1, 12 (1979)).

Under California law, prisoners serving indeterminate prison sentences "may serve up to life in prison, but they become eligible for parole consideration after serving minimum terms of confinement." In re Dannenberg, 34 Cal.4th 1061, 1078, 23 Cal.Rptr.3d 417 (2005). Generally, one year prior to an inmate's minimum eligible parole release date, the Board will set a parole release date "in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public." In re Lawrence, 44 Cal.4th 1181, 1202, 82 Cal.Rptr.3d 169 (2008) (citing Cal.Penal Code § 3041(a)). A release date will not be set, however, if the Board determines "that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration. . . ." Cal. Penal Code § 3041(b).

1    California state prisoners who have been sentenced to prison with the possibility
2 of parole have a clearly established, constitutionally protected liberty interest in receipt of a
3 parole release date.  Allen, 482 U.S. at 377-78 (quoting Greenholtz, 442 U.S. at 12); Irons v.
4 Carey, 505 F.3d 846, 850-51 (9th Cir. 2007) (citing Sass v. Cal. Bd. of Prison Terms, 461 F.3d
5 1123, 1128 (9th Cir. 2006)); Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003); McQuillion,
6 306 F.3d at 903.

7    In the context of parole proceedings, it is well established that inmates are not
8 guaranteed the "full panoply of rights" afforded to criminal defendants under the Due Process
9 Clause.  See Pedro v. Or. Parole Bd., 825 F.2d 1396, 1398-99 (9th Cir. 1987).  Nonetheless,
10 inmates are afforded limited procedural protections.  The Supreme Court has held that a parole
11 board's procedures are constitutionally adequate so long as the inmate is given an opportunity to
12 be heard and a decision informing him of the reasons he did not qualify for parole.  Hayward v.
13 Marshall, 603 F.3d 546, 560 (9th Cir. 2010) (quoting Greenholtz, 442 U.S. at 16).  As a matter of
14 state constitutional law, denial of parole to California inmates must be supported by "some
15 evidence" demonstrating future dangerousness.  Hayward, 603 F.3d at 562 (citing In re
16 Rosencrantz, 29 Cal.4th 616, 128, 128 Cal.Rptr.2d 104 (2002)); see also In re Lawrence, 44
17 Cal.4th at 1191 (recognizing the denial of parole must be supported by "some evidence" that an
18 inmate "poses a current risk to public safety"); In re Shaputis, 44 Cal.4th 1241, 1254, 82
19 Cal.Rptr.3d 213 (2008) (same).  "California's 'some evidence' requirement is a component of the
20 liberty interest created by the parole system of [the] state," Cooke v. Solis, 606 F.3d 1206, 1213
21 (9th Cir. 2010), and compliance with this evidentiary standard is, therefore, mandated by the
22 federal Due Process Clause.  Pearson v. Muntz, 606 F.3d 606, 611 (9th Cir. 2010).  Thus, a
23 federal court undertaking review of a "California judicial decision approving the . . . decision
24 rejecting parole" must determine whether the state court's decision "was an 'unreasonable
25 application' of the California 'some evidence' requirement, or was 'based on an unreasonable
26 determination of the facts in light of the evidence.'"  Hayward, 603 F.3d at 562-63 (quoting 28

1 U.S.C. § 2254(d)(2)).

2       When assessing whether a state parole board's suitability decision was supported by "some evidence," the analysis "is framed by the statutes and regulations governing parole suitability determinations in the relevant state." Irons, 505 F.3d at 851.  The court must look to California law to determine what findings are necessary to deem a petitioner unsuitable for parole, and then must review the record to determine whether the state court decision holding that these findings were supported by "some evidence" or whether it constituted an unreasonable application of the "some evidence" principle. Id.

      Title 15, Section 2402 of the California Code of Regulations sets forth various factors to be considered by the Board in its parole suitability findings for murderers.  The regulation is designed to guide the Board's assessment regarding whether the inmate poses an "unreasonable risk of danger to society if released from prison," and thus whether he or she is suitable for parole. In re Lawrence, 44 Cal.4th at 1202.  The Board is directed to consider all relevant, reliable information available, including the circumstances of the prisoner's:  social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release.  15 Cal.Code Regs. § 2402(b).

      The regulation also lists several specific circumstances which tend to show suitability or unsuitability for parole. 15 Cal. Code Regs. § 2402(c)-(d).  Factors tending to show unsuitability include:

> (1) The Commitment Offense.  The prisoner committed the offense in an especially heinous, atrocious or cruel manner.  The factors to be considered include:
>
>     (A) Multiple victims were attacked, injured or killed in the

same or separate incidents.

  (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.

  (C) The victim was abused, defiled, or mutilated during or after the offense.

  (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

  (E) The motive for the crime is inexplicable or very trivial in relation to the offense.

(2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

(3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.

(4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

(5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.

(6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail.

(15 Cal. Code Regs. § 2402(c).)

  Factors tending to show suitability include:

(1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

(2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

7

>   (4) Motivation for Crime.  The prisoner committed his crime as the result of significant stress in his life, especially if the stress has guilt of a long period of time.
>
>   (5) Battered Woman Syndrome.  At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.
>
>   (6) Lack of Criminal History.  The prisoner lacks any significant history of violent crime.
>
>   (7) Age.  The prisoner's present age reduces the probability of recidivism.
>
>   (8) Understanding and Plans for Future.  The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.
>
>   (9) Institutional Behavior.  Institutional activities indicate an enhanced ability to function within the law upon release.

(15 Cal. Code Regs. § 2402(d).)

The overriding concern is public safety, In re Dannenberg, 34 Cal.4th at 1086, and the focus is on the inmate's current dangerousness.  In re Lawrence, 44 Cal.4th at 1205.  Thus, under California law, the standard of review is not whether some evidence supports the reasons cited for denying parole, but whether some evidence indicates that a parolee's release would unreasonably endanger public safety.  In re Shaputis, 44 Cal.4th at 1241.  Therefore, "the circumstances of the commitment offense (or any of the other factors related to unsuitability) establish unsuitability if, and only if, those circumstances are probative to the determination that a prisoner remains a danger to the public."  In re Lawrence, 44 Cal.4th at 1212.  In other words, there must be some rational nexus between the facts relied upon and the ultimate conclusion that the prisoner continues to be a threat to public safety.  Id. at 1227.

The BPH found petitioner unsuitable for parole in 2006 for the following reasons. First, the BPH found petitioner unsuitable based on two factors related to the commitment offense.  In particular, the BPH found that the offense was carried out in a manner demonstrating a callous disregard for human life.  (Dkt. No. 10-4, at 25 of 134.)  The BPH also found that the

motive for the crime was trivial.  (<u>Id</u>.)  Regarding petitioner's criminal history, the BPH found that petitioner had a "pattern of criminal conduct."  (<u>Id</u>. at 26.)  The BPH also found that petitioner's disciplinary record of 12 counseling chronos and 6 disciplinary reports also rendered him unsuitable.  (<u>Id</u>. at 26-27.)

In order to put these findings into context, the undersigned will first summarize the facts of the commitment offense as discussed at the 2006 suitability hearing:

> On May 4th of 1987, at approximately 11:45 Sacramento Police Officers were dispatched to the American River Village apartments on Northview Drive to investigate a shooting incident.
>
> Upon their arrival, police officers were led to the body of a 22-year old victim, Louis Frank.  Mr. Frank had been shot three times.  A subsequent autopsy revealed that the victim died from multiple gunshots from a .32 caliber weapon.  A 12-year-old witness stated that she observed the prisoner, known as Uncle, standing in the alcove talking to a woman.
>
> The prisoner hushed the woman and stepped out of the alcove, approached the victim from behind, and shot him several times from a distance of about ten feet.
>
> After the shooting, the prisoner whistled to a friend who had just returned and they ran up the street. The 12-year-old witness related that just prior to the shooting, she saw the prisoner drive by with two other male subjects and park nearby.  She overheard one of the subjects say, let's go to the park and see if he is there.  The two subjects went to the park while the prisoner remained, but shortly thereafter, the victim appeared, and was shot by the prisoner.
>
> Officers interviewed a subject who was with the victim at the time of the shooting.  Statements by this witness were inconsistent but were essentially, the three men had approached him and the victim, and asked for some dope.  The victim stated that he did not sell any at which time the three individuals talked among themselves for about ten minutes.  Suddenly, one of the subjects started shooting at the victim.
>
> He believes the prisoner was the instigator of the shooting as he had seen the victim and the prisoner arguing several days earlier.  However, he did say that subject was not present, that subject was not present among the three subjects.
>
> Another witness stated that the aforementioned witness, the prisoner and two other subjects were involved in the sale of narcotics.  She had overheard the prisoner and two other subjects

9

       receive telephone calls at an apartment. The witness believed that the victim was killed because he was interfering with the sale of narcotics in the apartment complex.

       Another witness reported that prior to the shooting, she made a joke about a gun to the prisoner, who replied by offering the woman 40 dollars for the use of a weapon. She replied that she did not know where her gun was located and believed that the prisoner already had a gun concealed in his waistband under a trench coat.

       On May 5th of 1987, officers observed the suspect vehicle in the vicinity of the apartments and questioned the three occupants. One of the subjects had nine 25 caliber rounds in his pocket. One of the three subjects gave permission for the officers to search their apartment, where officers discovered a .25 caliber and a 357 caliber handgun with ammunition. These weapons were not used in the shooting.

       Prisoner was subsequently arrested on July 8th of 1987 after surrendering. The prisoner had admitted that he had been at the scene prior to the shooting, but had left the area before the incident occurred. He also admitted that he had argued with the victim a couple of days prior to the shooting.

       In regards to the prisoner's version, the prisoner was interviewed on 5/9 of 2004, and told his counselor his version of the circumstances of this offense, had not changed in the statement he made in the probation officer's report. He admits that he was involved in the sales of a controlled substance, but is not the individual responsible for taking the victim's life.

(Dkt. No. 10-3, at 70-73 of 130.)

       The undersigned first considers whether petitioner's commitment offense demonstrated a callous disregard for human suffering, as found by the BPH. The BPH found that the offense was an "execution over a drug territory." (Dkt. No. 10-4, at 25 of 134.) In its decision, the BPH stated that,

       A 12-year-old female witness stated that prior to the shooting, she saw the victim walking past her at the apartment complex. Next, she saw the inmate standing in a darkened alcove talking to a woman. He then hushed the woman, stepped out of the alcove, approached the victim from behind and shot him several times from a distance of about ten feet.

       After the shooting, the inmate whistled to a friend and when he returned, they ran up the street.

(Id.)

Petitioner's unprovoked shooting of the victim at close range qualified as an offense demonstrating a callous disregard for human suffering. See Smith v. Kane, 2010 WL 1260201, * 8 (N.D.Cal. 2010) ("Shooting [the victim] at [close] range would [certainly] qualify as an offense carried out in a manner which demonstrates an exceptionally callous disregard for human suffering."); Kobe v. Kane, 2007 WL 1462386, *4 (N.D. Cal. 2010) (shooting victim at close range without provocation provides sufficient evidence demonstrating callous disregard for human suffering).

The BPH also found that petitioner's motive for the shooting was trivial. "The reference in Board regulations to motives that are 'very trivial in relationship to the offense' therefore requires comparisons; to fit the regulatory description, the motive must be materially less significant (or more 'trivial') than those which conventionally drive people to commit the offense in question, and therefore more indicative of a risk of danger to society if the prisoner is released than is ordinarily presented." In re Scott, 119 Cal.App.4th 871, 893 (2004).

Petitioner shot the victim as part of "an execution over a drug territory." (Dkt. No. 10-4, at 25.) Based on the standard set forth above, the undersigned finds that petitioner's motive for killing the victim was trivial.

The undersigned now considers whether the circumstances of the commitment offense were "some evidence" of petitioner's current dangerousness. "The aggravated nature of the crime does not in and of itself provide some evidence of current dangerousness to the public unless the record also establishes that something in the prisoner's pre or post incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety." In re

Lawrence, 44 Cal.4th at p. 1214.[2]

At the time of the 2006 suitability hearing, petitioner's first suitability hearing, he had been incarcerated for 18 years. However, during that time period, petitioner had 6 disciplinary convictions. (Dkt. No. 10-3, at 91.) In 1989, petitioner was found guilty of disobeying a direct order. (Id.) On January 13, 1990, petitioner was found guilty of refusing to work. (Id.) On December 14, 1990, petitioner was found guilty of delaying lock-up. (Id.) On February 10, 1994, petitioner was found guilty of misuse of inmate phones. (Id.) On January 29, 2000, petitioner was found guilty of fighting, and on February 15, 2002, he was found guilty of disobeying a direct order. (Id.) Petitioner had twelve counseling chronos, the last of which was January 11, 1997, for possession of unauthorized food. (Id.)

Petitioner's 2000 conviction for fighting and 2002 conviction for disobeying a direct order demonstrated that the circumstances of his commitment offense were still relevant to determining current dangerousness. Petitioner characterized his fighting conviction as involving "horseplay" rather than fighting. (Id.) The circumstances of petitioner's conviction for disobeying orders were discussed at the suitability hearing:

> Deputy Commissioner Sullivan: Okay. And the disobeying a direct order had to do with being in the dining room. They're doing a random clothed body search. They asked you to turn around to be

---

[2] At the time of the 2006 suitability hearing, petitioner had not yet served his base term. The California Court of Appeal recently rejected an argument that the circumstances of the commitment offense are per se predictive of risk if the prisoner has not served his base term:

The Attorney General also argues that because Shippman's 2008 parole denial occurred after he had served only 13 years of his sentence--less than his base term--the commitment offense is predictive of his risk if paroled. This argument is both illogical and disregards the scheme articulated by the Supreme Court in In re Dannenberg (2005) 34 Cal.4th 1061, 23 Cal.Rptr.3d 417, 104 P.3d 783. Suitability for parole and the appropriate base term for the offense are distinct issues, with the former to be determined prior to and independent of the latter. Were it otherwise, it would be necessary to determine the base term before determining suitability, which is the approach rejected in Dannenberg.

In re Shippman, 185 Cal.App.4th 446, 474 at n.8, 110 Cal.Rptr.3d 326 (2010).

>searched and you said why are you picking me out? You said you hadn't done anything, and you then pulled away. This is according to correctional officer Evon, E-V-O-N. The 115 is dated February 15th, 2002. It said that you said, don't ever lay a hand on me. You don't touch a black man. And then you submitted to the search. There's profanity exchanged between you and him, it looks like. What happened with that?
>
>Petitioner: Well, first of all, I didn't say that, what he said, don't touch a black man. I told him not to put his hands on me. As I was walking out the door, he reached out and grabbed me, and I told him not to put his hands on me. And then from there he searched me and I did everything he told me to do. We exchanged some words, and he searched me and he wrote me up.

(Id. at 91-92.)

The fact that petitioner had these disciplinary convictions within six and four years of the 2006 suitability hearing demonstrated that the circumstances of the commitment offense were still relevant to determining his current dangerousness. These disciplinary convictions could also be characterized as having been committed based on trivial motives.[3]

The BPH also found petitioner unsuitable based on his criminal history. Petitioner's prior criminal record including convictions in 1986 for giving false information to a police officer and carrying a loaded firearm in a public place. (Id. at 83.) These convictions did not involve the infliction of violence of any person, nor could this history be characterized as a "significant history of violent crime." See 15 Cal. Code Regs., §§ 2402(c)(2), (d)(6). Accordingly, the undersigned does not find that petitioner's criminal history was "some evidence" of his current dangerousness.

The BPH also found petitioner unsuitable based on his prison disciplinary history. These convictions, and in particular the 2000 and 2002 offenses, were "some evidence" that petitioner continued to be a threat to public safety. See Penn v. Ayres, 2008 WL 1930661, at *7-8 (N.D.Cal. 2008) (reasoning that an inmate's two post-conviction disciplinary reports

---

[3] Assuming petitioner remains disciplinary free, these disciplinary convictions as well as the circumstances of his commitment offense will have diminishing relevance over time.

13

undermined his argument that he had been rehabilitated and was suitable for parole).

While the BPH also found that the psychological report by Dr. Rekert was inconclusive, it did not base its decision on this report. (Dkt. No. 10-4, at 27 of 134.) The BPH ordered a new psychological report for petitioner's next suitability hearing. (Id. at 32.) Because the BPH did not base its decision on the psychological report, the undersigned need not discuss this report further.

For the reasons discussed above, the undersigned finds that the 2006 decision by the BPH finding petitioner unsuitable for parole was supported by some evidence.[4] There was "some evidence" that petitioner posed an unreasonable risk of danger to society if released from prison. However, the undersigned notes that several factors discussed at the hearing supported a finding of suitability. The BPH acknowledged that petitioner had viable parole plans. (Dkt. No. 10-4, at 28 of 134.) The BPH also noted petitioner's significant vocational accomplishments,

---

[4] The undersigned observes that at the 2006 suitability hearing, petitioner denied any involvement in the shooting. Although the BPH did not find petitioner unsuitable based on his failure to admit his involvement, at the conclusion of the hearing it expressed concern regarding petitioner's claim of innocence considering the strong evidence against him. California law precludes the BPH from requiring an inmate to admit his guilt. See Cal. Penal Code § 5011(b) ("The Board ... shall not require, when setting parole dates, an admission of guilt to any crime for which an inmate was committed."); 15 Cal. Code Regs. § 2236 ("The board shall not require an admission of guilt to any crime for which the prisoner was committed."). On the other hand, the BPH need not blindly accept an inmate's protestations of innocence. Torricellas v. Davison, 519 F.Supp.2d 1040, 1052-53 & n.8 (C.D.Cal. 2007). Therefore, petitioner's claim of innocence would not prevent the BPH from considering his lack of insight. See 15 Cal. Code Regs. § 2402 (Board "shall ... consider" all relevant, reliable information, including petitioner's "past and present attitude toward the crime" as well as "any other information which bears on the [petitioner's] suitability for release."); Velasquez v. Carey, 2009 WL 1953451, *8 n.4 (E.D. Cal. 2009) ("Consideration of whether an inmate lacks insight into or accepts responsibility for the commitment offense does not conflict with the statutory requirement of [P.C.] section 5011(b) that the Board 'shall not require, when setting parole dates, an admission of guilt to any crime for which an inmate was committed.' "); Ochoa v. Marshall, 2009 WL 86563, *8 (C.D. Cal. 2009) ("Section 5011 of the California Penal Code and section 2236 of title 15 of the California Code of Regulations, which assertedly prohibit the Board from requiring an admission of guilt, do not preclude the Board from weighing a convicted murderer's lack of insight."). Because the BPH did not find petitioner unsuitable based on his failure to admit involvement in the offense, no further discussion of this issue is warranted.

which included numerous laudatory chronos.  (Id. at 29.)  Petitioner had also obtained his GED.  (Id.)  In addition, petitioner had participated in numerous self-help and therapy groups.  (Id.)  However, at the time of the 2006 hearing, petitioner's accomplishments in prison did not outweigh the factors properly relied on by the BPH to find him unsuitable.

After conducting an AEDPA review, the undersigned recommends that this claim be denied.

IV.  Conclusion

The undersigned recommends that petitioner's application for a writ of habeas corpus be denied.  If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(3).

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:  September 24, 2010

_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

fuq2055.157